UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

CARREY B. WILLIAMS,

                Plaintiff,

-against-                                                                               1:14-cv-0944 (LEK)

COMMISSIONER OF SOCIAL
SECURITY,

                Defendant.

_____

## DECISION and ORDER

**I. INTRODUCTION**

This case has proceeded in accordance with General Order 18, which sets forth the procedures to be followed in appealing a denial of Social Security benefits. Both parties have filed briefs. Dkt. Nos. 19 ("Plaintiff's Brief");[1] 18 ("Defendant's Brief"). For the following reasons, the judgment of the Social Security Administration ("SSA") is affirmed.

**II. BACKGROUND**

Plaintiff was born on August 3, 1967 and has a high school education. Dkt. No. 13 ("Record") at 37, 38. Plaintiff has a history of drug abuse and has been in recovery from cocaine and alcohol abuse since March 6, 2011. R. at 237-38. Plaintiff worked as a certified nursing assistant ("CNA") for six years before her termination in 2007. R. at 39-40. Plaintiff claims that her HIV status and accompanying depression and anxiety bar her from all gainful work activity.

---

[1] Plaintiff is proceeding *pro se* and therefore her submissions will be interpreted liberally. Haines v. Kerner, 404 U.S. 519, 520-21 (1972). Nevertheless, *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law. Traguth v. Zuck, 710 F.2d 90, 92 (2d Cir. 1983).

Pl.'s Br. at 1.

**A. Psychiatric Treatment**

Plaintiff has a history of depression and anxiety disorders. R. at 273. Plaintiff is uncertain of her specific diagnosis, but believes she may have been diagnosed in the past as having bipolar disorder or PTSD.[2] Id. Plaintiff reported she began struggling with depression at age sixteen, after the birth of her first child, and her first psychiatric hospitalization, for severe depression, occurred in 1990. R. at 380-81.

Plaintiff was hospitalized from January 31, 2008 until February 6, 2008, after she appeared in the emergency room and began "acting bizarrely." R. at 222. It was later discovered that she had recently had a fight with her boyfriend. R. at 228. During her intake interview, Plaintiff provided nonsensical responses and appeared to be disoriented. R. at 222. Dr. Gary Merrill ("Dr. Merrill") observed that Plaintiff's attention and concentration were markedly impaired and she "related in a very bizarre manner." R. at 222-23. He believed she may have been experiencing or responding to auditory hallucinations and referred her for a complete psychiatric assessment. R. at 223. She was diagnosed with an unspecified psychotic disorder, cocaine abuse, partner relational problems, and severe financial problems. Id. During the course of her hospitalization, Plaintiff was treated with Zyprexa and showed improvement in organization of thoughts and behaviors over the last two to three days of her admission. Id. On the day of her discharge, a family meeting was held, during which Plaintiff's brother and young-adult daughter believed she had returned to her usual self and stated that she had never posed a danger to herself or others. Id. Plaintiff was discharged with instructions to abstain from alcohol and drugs and to follow up with the Clinical Behavioral Health

---

[2] None of Plaintiff's medical records confirm this diagnosis.

2

Organization.  Id.

Plaintiff underwent a consultative psychiatric evaluation on October 20, 2011 with psychiatrist Dr. Brett T. Hartman ("Dr. Hartman").  R. at 380.  Dr. Hartman observed that Plaintiff was cooperative, but restless and agitated.  R. at 382.  Plaintiff explained that she experiences sadness, social isolation, crying spells, hopelessness, guilt, loss of interest, and irritability.  R. at 381.  She claimed that although she has thought about suicide, she does not believe that she could ever go through with it.  Id.  Dr. Hartman also observed that Plaintiff had a high degree of social anxiety.  Id.  She reported memories of being abused and stated that she has occasional flashbacks and nightmares and startles easily.  Id.  She stated that she does not handle pressure well, including job pressure, and that she struggles whenever she is assigned more than one or two tasks.  Id.

Dr. Hartman found Plaintiff's attention and concentration to be mildly impaired.  R. at 382.  She counted without difficulty and performed fairly well with calculations but lost track during part of the evaluation.  Id.  He found Plaintiff's recent and remote memory skills to be generally intact: she could recall four out of four objects immediately and three out of four after five minutes.  Id.  He found her intellectual functioning to be somewhat below average, her insight to be fair, and her judgment was fair to poor.  Id.  She was able to follow and understand simple directions and instructions and to perform a variety of simple tasks.  R. at 383.  Dr. Hartman observed that Plaintiff has mild difficulty maintaining a regular schedule and has significant learning impairment.  Id.  He opined that she would have problems performing complex tasks independently and struggles to make appropriate decisions and deal with the normal stressors of life.  Id.  He diagnosed her with major depressive disorder, social phobia, and cocaine dependence in partial remission.  Id.  Dr. Hartman concluded that Plaintiff did not suffer from posttraumatic stress disorder and

3

recommended that she continue her current mental health services and drug treatment program. R. at 384. He recommended that Plaintiff eventually be considered for a vocational training program and that she should not be able to manage her own finances given her history of reckless spending. Id.

Plaintiff was first seen by the Albany Medical Center Outpatient Psychiatry Clinic on January 18, 2012, by Melissa Ficarra and Dr. Kachigere Krishnappa. R. at 557. Plaintiff reported being significantly depressed following the death of her mother in 2010, after which she had a relapse with her cocaine addiction. R. at 558. She also identified her HIV positive status as a major source of her depression. Id. It was recommended that Plaintiff participate in psycotherapy and medicinal therapy. Id. On March 6, 2012, Nurse Practitioner Minda Dwyer ("Ms. Dwyer") reported that Plaintiff was receiving mental health counseling every two weeks at Albany Medical Center. R. at 428. Plaintiff was prescribed Celexa but had not taken it due to concerns about how it would make her feel. Id. Plaintiff complained of fatigue and irritability. Id.

**B. HIV and Gynecological Treatment**

Plaintiff was diagnosed with HIV in May 2009, during pregnancy. R. at 237, 271, 273. When Plaintiff began treatment, she had a CD4 count of 226 and a viral load of 67,566. R. at 271-72, 339, 343.[3] Plaintiff has been taking antiretroviral medication since her pregnancy, with the exception of a lapse in treatment in 2010-11 when she was abusing cocaine and subsequently

---

[3] According to the U.S. Department of Health and Human Services, a normal CD4 count ranges from 500 to 1,200. The term "viral load" refers to the amount of HIV in a sample of a patient's blood. An "undectectable" viral load is somewhere between forty and seventy five copies. See U.S. Dep't of Health and Human Servs., Viral Load, Aids.gov, http://www.aids.gov/hiv-aids-basics/just-diagnosed-with-hiv-aids/understand-your-test-results/viral-load/index.html (last visited March 24, 2016).

incarcerated. R. at 237, 244. Following her release from Albany County Jail in 2011, Plaintiff resided at Next Step halfway house and resumed treatment for HIV. R. at 244. Plaintiff's treatment is overseen by Ms. Dwyer and Dr. Cynthia Miller ("Dr. Miller"). R. at 244-45. With the exception of her relapse and incarceration in 2010-11, Plaintiff attended regular visits with Ms. Dwyer and Dr. Miller and routinely denied having fevers, chills, sweats, nausea, or diarrhea. R. at 244, 249, 255, 259, 428. On July 14, 2009, Dr. Miller determined that Plaintiff's HIV was much improved. R. at 265. On May 13, 2010, Dr. Miller reported that based on Plaintiff's CD4 and viral levels, her disease was stable. R. at 249. On November 21, 2011, Dr. Miller stated that Plaintiff's HIV was 100% stable with adherence to treatment. R. at 434. On February 29, 2012, Plaintiff's HIV was determined to be stable with labs showing a CD4 count over 900 and an undetectable viral load. R. at 430. On March 6, 2012, Dr. Miller again reported that Plaintiff's HIV was stable, with a CD4 count of 1112 and a viral load of less than forty. R. at 428. In July 2012, Plaintiff complained that she was "tired of taking so many pills" and Dr. Dwyer discussed the possibility of switching Plaintiff to a single tablet treatment for her HIV treatment as long as her disease remained undetectable. R. at 551.

Plaintiff has been treated at Albany Medical Center with Dr. Byrd Cleveland ("Dr. Cleveland") for women's health issues since April 2011. R. at 234. She was treated for chlamydia in 2008 and had a history of gonorrhea, HSV, and trichomonas. R. at 237. Plaintiff has had two miscarriages, two abortions, and five live births. Id. She tested positive for Hepatitis B and negative for Hepatitis A and C. R. at 238. She was diagnosed with trichomonas and bacterial vaginosis in April 2011. R. at 234.

On May 31, 2011, Dr. Cleveland observed that Plaintiff had not been taking Valtrex, as

5

prescribed to treat herpes, on a regular basis and had a painful spot on her vulva that had been present there for a few days. Id. During this visit, Plaintiff was treated for a herpes outbreak, but Dr. Byrd found that her trichomonas and bacterial vaginosis were both resolved after treatment. R. at 235. She also reported pain in her right lower abdomen, which Dr. Byrd believed to be gastrointestinal in nature. Id. Plaintiff agreed to have a pap smear and a mammogram during this visit. Id.

In July 2011, Plaintiff sought treatment at Albany Medical Center for left abdominal pain during a women's health visit. R. at 232. Dr. Cleveland believed that the abdominal pain was musculoskeletal in nature and not related to Plaintiff's gynecology, and referred Plaintiff to Dr. Dwyer. R. at 233. After Plaintiff's pap smear reported an abnormal result, a follow-up colposcopy and asoscopy were performed on July 27. Id. Plaintiff was also treated for a previously diagnosed vulvar lesion and instructed to continue applying medicated cream to the wound. Id.

**C. Miscellaneous**

Plaintiff complains of bilateral foot pain when she does a lot of walking. R. at 238. She stated that her feet do not hurt when she wakes up in the morning. Id. She also takes ibuprofen regularly to deal with the pain in her lower extremities. R. at 255, 257. On June 23, 2011, Dr. Mitchel Campito ("Dr. Campito") took x-rays of Plaintiff's feet. R. at 351, 353. He noted that Plaintiff had a tiny posterior plantar calcaneal spur on her left foot and that both feet showed minimal features of degenerative osteoarthritis, had moderate valgus deformities, and showed moderate soft tissue inflammation. Id. Overall, he found Plaintiff's foot structures to be normal in configuration, her joints to be well maintained, and her soft tissues to be otherwise unremarkable. Id. He concluded that the films were otherwise unremarkable for a person of Plaintiff's age. Id.

On March 2, 2012, Plaintiff complained of leg pain to Ms. Dwyer. R. at 429. Ms. Dwyer believed that this could have been caused by Plaintiff's history of Vitamin D deficiency and recommended treating with Vitamin D supplements. Id. Additionally, Plaintiff was diagnosed with psoriasis and was prescribed a topical ointment to treat her symptoms. R. at 257. Dr. Sanra Laity ("Dr. Laity") recommended that Plaintiff take naproxen, wear over-the-counter inserts in her shoes, and apply a topical ointment to help alleviate foot pain. R. at 358.

A consultative exam performed on October 20, 2011 by Dr. Kautilya Puri ("Dr. Puri") found that Plaintiff did not have any objective limitations to communication, fine motor, or gross motor activity. R. at 387. Dr. Puri found no objective limitations to Plaintiff's gait or activities of daily living. Id. It was recommended that Plaintiff not carry out strenuous activity and that she be seen by a psychologist. Id.

**D. Procedural History**

Plaintiff filed a Title II application for disability insurance benefits and a Title XVI application for supplemental security income on July 27, 2011, alleging disability beginning on August 1, 2008 because of HIV, cervical cancer, gout, depression, and anxiety. R. at 19, 60. Consulting psychologist Dr. Mark Tatar ("Dr. Tatar") completed the Psychiatric Review Technique and Mental RFC for Plaintiff on November 21, 2011. R. at 388. He found that Plaintiff had mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. R. at 398. He concluded that despite having some symptoms of depression and anxiety, Plaintiff had the ability to perform simple and some complex tasks, sustain a pace, relate to others, and respond to changes in a work situation. R. at 404. Plaintiff's claims were initially denied on November 28, 2011. R. at 56.

Plaintiff's request for a hearing was granted, and Plaintiff appeared and testified at a hearing held on December 12, 2012 in Albany, New York. R. at 65-66, 84. At the hearing, Plaintiff was represented by counsel. R. at 19, 112.

### 1. *Administrative Hearing*

The administrative hearing was held before Administrative Law Judge ("ALJ") Carl E. Stephan. R. at 36. Plaintiff testified that she was presently unemployed and that although she recently completed relicensing for her CNA certificate, she was unsure whether she would be able to work as a CNA. R. at 39. She testified that she last worked in 2007 as a CNA at Resurrection Nursing Home. R. at 39-40. Plaintiff stated that the Department of Health removed her from her position because she had fifteen misdemeanors relating to drug possession. R. at 40. Prior to her removal, Plaintiff had worked as a CNA for approximately six years. Id.

Plaintiff testified that she had a history of cocaine abuse but stopped using in March 2011. R. at 40. She completed a rehabilitation program at Next Step on November 23, 2011. R. at 41. She stated that she was currently seeking mental health treatment once a week with a psychotherapist and once a month with a psychiatrist at Albany Medical Center. R. at 42. Plaintiff reported taking Zyprexa and her HIV medications. R. at 42-43. She stated that as a result of her HIV, she feels tired a lot and vomits frequently. R. at 43.

Plaintiff testified that she has difficulty concentrating and interacting with other people, which prevents her from working. R. at 41-42. She also stated that she sometimes has anxiety. R. at 42. Plaintiff stated that when she was in treatment, she made a lot of mistakes during her required volunteer work at a nursing home because she could not remember the procedures they wanted her to follow. Id. For example, during her volunteer work, Plaintiff would take the wrong resident to

8

the bathroom or give the wrong food to a resident. R. at 44. Plaintiff stated that she had difficulty remembering the assignments she was given. Id. At the time of the hearing, Plaintiff testified that she sometimes forgets her appointments and finds herself sleeping a lot and lacking motivation to do things. Id. Roughly three times per week, Plaintiff will not get out of bed at all and her friends will come over to fix her something to eat. Id.

   *2. ALJ's Decision*

  The SSA issued a decision denying Plaintiff's claim on February 13, 2013, finding that Plaintiff did not suffer from a disability within the meaning of the Social Security Act from August 1, 2008 until the date of decision. R. at 16, 19. The ALJ found that Plaintiff met the insured status requirements of the SSA and had not engaged in substantial gainful activity since August 1, 2008, the alleged onset date of her disability. R. at 21. The ALJ identified Plaintiff's HIV, major depressive disorder, and cocaine dependence as severe impairments; however, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. at 21-22.

  Specifically, the ALJ found that Plaintiff's HIV did not meet the listing in "14.08 HIV infection because there is no medical evidence of bacterial, fungal, protozoan or helminthic, or viral infections as described in 14.00F or malignant neoplasms." R. at 22. In addition, the ALJ noted no medical evidence of conditions of the skin or mucous membranes with extensive fungating or ulcerating lesions that were not responding to treatment, HIV encephalopathy, HIV wasting syndrome, and diarrhea lasting for a month or longer, resistant to treatment and requiring intravenous hydration, intravenous alimentation, or tube feeding. Id. The ALJ further found no medical evidence of sepsis, meningitis, pneumonia, septic arthritis, endocarditis, or sinusitis that is

9

resistant to treatment or requires hospitalization three or more times in a twelve month period. Id. Lastly, the ALJ concluded that there was no medical evidence that Plaintiff's HIV status resulted in marked limitation in her activities of daily living, marked limitation in maintaining social functioning, or marked limitation in Plaintiff's ability to complete tasks in a timely manner. Id.

The ALJ found that Plaintiff had the following degree of limitation in the functional areas laid out in 20 C.F.R. Part 404, Subpart P, Appendix 1: mild restriction in activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation of extended duration. R. at 22. With respect to activities of daily living, the ALJ relied on Plaintiff's testimony, as well as the opinion of DDS consultant, Dr. Tatar, who found that Plaintiff was only mildly restricted in her ability to perform activities of daily living. Id. In terms of social functioning, the ALJ noted Plaintiff's testimony that she has difficulty interacting with others, but that she has no problem interacting with authority figures and that she does spend time with friends. R. at 23. With regard to concentration, persistence, or pace, the ALJ concluded that Plaintiff had moderate difficulties after considering Plaintiff's testimony that she has trouble concentrating, but that she can follow both spoken and written instructions. Id. The ALJ found that Plaintiff's hobbies of reading and crocheting required the ability to maintain attention and concentration. Id. The ALJ also relied on Dr. Tatar's opinion that Plaintiff only had moderate difficulties with regard to concentration, persistence, or pace. Id.

With respect to decompensation, the ALJ found that Plaintiff's seven day hospitalization for psychiatric treatment in 2008 fell short of the two week durational requirement for an episode of decompensation. Id. The ALJ also noted Dr. Tatar's finding that Plaintiff had experienced no

10

episodes of decompensation. Id.

With respect to Plaintiff's depression, the ALJ found that the severity of Plaintiff's depression did not meet the requirements of listing 12.04 for affective disorders or listing 12.06 for anxiety related disorders. R. at 22. The ALJ stated that under 12.04, Plaintiff's depression must satisfy the requirements of either paragraphs A and B or paragraph C. Id. Under 12.06, Plaintiff's depression must satisfy the requirements of paragraphs A and B or paragraphs A and C. Id.

The ALJ found that Plaintiff did not satisfy criteria B because Plaintiff's depression did not cause marked limitations in any functional area and Plaintiff had not experienced three or more episodes of decompensation of extended duration. R. at 24. He found that Plaintiff did not meet the criteria in paragraph C because there was no evidence establishing that Plaintiff has had repeated episodes of decompensation of extended duration, there were no signs that Plaintiff was likely to decompensate, there was no evidence that Plaintiff was unable to function outside a highly supportive living arrangement for over a year, or that Plaintiff's impairments result in a complete inability to function independently outside the home. Id.

The ALJ then determined that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) and unskilled work as defined in 20 C.F.R. §§ 404.1568(a) and 416.968(a), with the additional limitation that Plaintiff can only make simple work-related decisions. Id. The ALJ found that Plaintiff's medically determinable impairments could be expected to cause some of her reported symptoms; however, he found that Plaintiff's testimony regarding their intensity, persistence, and limiting effects was not entirely credible. R. at 25. The ALJ found that Plaintiff's HIV is well controlled, citing the opinions of Dr. Miller, Nurse Practitioner Samara Gabree, and Ms. Dwyer, as well as Plaintiff's diagnostic testing, which revealed

that Plaintiff's CD4 cell count rose and that her viral load dropped significantly after seeking treatment. R. at 25. The ALJ also took issue with Plaintiff's lack of consistent mental health treatment and noncompliance with prescribed medication following her alleged onset of disability. R. at 25-26.

The ALJ also found that recent clinical findings were not consistent with the symptoms and limitations that claimant alleged. R. at 26. Specifically, he noted that Dr. Hartman found that Plaintiff's attention and concentration were only mildly impaired and that her memory was generally intact. Id. Dr. Puri observed that Plaintiff was in no acute distress, her gait was normal, her squat was full, her stance was normal, and she could walk on her heels and toes without difficulty. Id. Dr. Puri observed that Plaintiff had a full range of motion in the cervical and lumbar spines as well as in her upper and lower extremities, and that her joints were stable and displayed no tenderness. Id.

The ALJ concluded that there was insufficient medical evidence to conclude that Plaintiff's history of drug abuse prevented her from working. R. at 16. Claimant stopped using drugs in May 2009 and was in inpatient rehabilitation from June 2009 until January 2010. Id. He noted Plaintiff's two relapses—one from July to October 2010 and one from January to March 2011—followed by Plaintiff's return to rehab from March to November 2011. Id. Following treatment, Plaintiff appeared to be stable and maintained her sobriety. Id. The ALJ found that Plaintiff's drug abuse did not prevent her from working for any continuous twelve month period, but that in any event, "drug abuse cannot be a material factor to a determination of disability." R. at 26-27.

The ALJ found that Plaintiff could not perform any of her past relevant work as a nurse

12

assistant because she is limited to performing a reduced range of light work and that work is performed at the medium exertional level. R. at 28. After considering Plaintiff's age, education, work experience, and RFC, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. Id. Plaintiff filed a request for review with the Appeals Council, which was denied on April 13, 2013. R. at 1.

### III. LEGAL STANDARD

#### A. Standard of Review

When the Court reviews the SSA's final decision, it determines whether the ALJ applied the correct legal standards and if the decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g); Roat v. Barnhart, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010) (Kahn, J.) (citing Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982)). Substantial evidence amounts to "more than a mere scintilla," and it must reasonably support the decision maker's conclusion. Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). The Court defers to the Commissioner's decision if it is supported by substantial evidence, "even if it might justifiably have reached a different result upon a *de novo* review." Sixberry v. Colvin, No. 12-CV-1231, 2013 WL 5310209, at *3 (N.D.N.Y. Sept. 20, 2013) (quoting Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)). However, the Court should not uphold the ALJ's decision when it is supported by substantial evidence, but it is not clear that the ALJ applied the correct legal standards. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

#### B. Standard for Benefits

According to SSA regulations, disability is "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). An individual seeking disability benefits "need not be completely helpless or unable to function." De Leon v. Sec'y of Health & Human Servs., 734 F.2d 930, 935 (2d Cir. 1984) (quoting Gold v. Sec'y of Health, Educ. & Welfare, 463 F.2d 38, 41 n.6 (2d Cir. 1972)).

In order to receive disability benefits, a claimant must satisfy the requirements set forth in the SSA's five-step sequential evaluation process. 20 C.F.R. § 404.1520(a)(1). In the first four steps, the claimant bears the burden of proof; at step five, the burden shifts to the SSA. Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (quoting Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996)). The five-step analysis used by the SSA is sequential, meaning that the determination at each step dictates whether the analysis proceeds to the subsequent step. Gennardo v. Astrue, 333 F. App'x 609, 610 (2d Cir. 2009). If the SSA is able to determine that the claimant is disabled or not disabled at any step, the evaluation ends. 20 C.F.R. § 404.1520(a)(4). Otherwise, the SSA will proceed with the analysis. Id.

At step one, the SSA considers whether the claimant's current work is "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If it is, the claimant is not disabled under the SSA standards. Id. At step two, the SSA considers whether the claimant has a severe medically determinable physical or mental impairment, or combination of impairments that is severe, that meets the duration requirement in 20 C.F.R. § 404.1509. Id. § 404.1520(a)(4)(ii). If she does not have such an impairment, the claimant is not disabled under the SSA standards. Id. At step three, the SSA considers the severity of the claimant's medically determinable physical or mental impairment(s) to see if it meets or equals an impairment and the requisite duration listed in 20

C.F.R. Part 404, Subpart P, Appendix 1. Id. § 404.1520(a)(4)(iii). If it does not, the SSA continues to step four to review the claimant's RFC and past relevant work. Id. § 404.1520(a)(4)(iv). The claimant is not disabled under the SSA standards if the RFC reveals that the claimant can perform past relevant work. Id. If the claimant cannot perform her past relevant work, the SSA decides at step five whether adjustments can be made to allow the claimant to work somewhere in a different capacity. Id. § 404.1520(a)(4)(v). If appropriate work does not exist, then the SSA considers the claimant to be disabled. Id.

## IV.   DISCUSSION

Plaintiff is *pro se* and submitted a two page letter brief in support of her appeal of the ALJ's decision. See Pl.'s Br. Plaintiff summarizes her relevant medical history and asserts that her impairments render her unable to work, however, she does not make specific objections to the ALJ's decision. Id. In light of Plaintiff's *pro se* status, the Court assumes that Plaintiff generally alleges that the ALJ committed legal error and that his decision was not supported by substantial evidence. Daviau v. Astrue, No. 09-cv-0870, 2012 WL 13543, at *2 (N.D.N.Y. Jan. 4, 2012).

To determine whether the ALJ's findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn. Mongeur v. Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983). After reviewing the ALJ's decision and the Record as a whole, the Court finds that the ALJ's decision is supported by substantial evidence.

When determining Plaintiff's RFC, the ALJ properly considered all medical source opinions. It was proper for the ALJ to give great weight to Nurse Practitioner Dwyer's opinions because even though she was not an acceptable medical source, she specialized in HIV treatment and had an

extensive history and relationship as Plaintiff's primary treatment provider. R. at 27; see also 20 C.F.R. § 404.1513(d)(1); SSR 06-03p (factors to be considered when evaluating the opinion of a source who is not an acceptable medical source are the degree to which the source presents relevant evidence to support her opinion and whether the source has a specialty related to the claimant's impairment). The ALJ also considered Plaintiff's diagnostic testing, which corroborated Dr. Miller and Nurse Practitioner Dwyer's findings that Plaintiff's HIV was well-controlled.

The ALJ properly assigned great weight to the opinion of consultative examiner Dr. Puri, who concluded that Plaintiff was not limited in her motor skills, ability to walk, or activities of daily living. R. at 27, 387. Dr. Puri's opinion was consistent with extensive findings in the Record that found that Plaintiff was in no acute distress, had a normal gait, stance, and range of motion, and no impairments to her mobility. R. at 386-87. See Mongeur, 722 F.2d at 1039 (stating that opinion of consultative physician may constitute substantial evidence).

With respect to Plaintiff's mental RFC, the Court finds that the ALJ properly considered the Record as a whole when determining that Plaintiff should be limited to unskilled work that involved making only simple decisions. R. at 24-27. In reaching this conclusion, the ALJ noted Plaintiff's lack of consistent mental health treatment and noncompliance with prescribed medication following the alleged onset of her disability. R. at 25-26. He also relied on Dr. Hartman's findings that Plaintiff's attention and concentration were only mildly impaired and that her memory was generally in tact. R. at 26, 282-83.

When considering a claimant's symptoms, including allegations of pain, the ALJ must consider "the extent to which [a claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence . . . ." 20 C.F.R. §§ 404.1529(a), 416.929(a). An ALJ is

16

instructed to carefully consider a claimant's individual statements regarding their symptoms with the rest of the evidence in the record in order to reach a conclusion about the credibility of a claimant's statements if a disability determination cannot be made solely on the basis of objective medical evidence. SSR 96-7P, 1996 WL 374186, at *1 (S.S.A. July 2, 1996).

> If an individual's statement about pain or other symptoms are not substantiated by the objective medical evidence, the adjudicator must consider all of the evidence in the case record, including any statements by the individual and other persons concerning the individual's symptoms. The adjudicator must then make a finding on credibility of the individual's statements about symptoms and their functional effects.

Id. at *4. The ALJ properly determined that Plaintiff's subjective complaints about her symptoms were not credible, as they were contradicted by evidence in the Record. R. at 25. For example, Plaintiff testified that she vomited frequently, R. at 43, but she denied any nausea or vomiting to her HIV treatment team at her routine checkups. R. at 238, 249, 255, 257, 259, 261, 265, 267, 271, 274, 430, 434, 439, 551. The ALJ also found that Plaintiff's complaints about leg and foot pain were inconsistent with repeated statements denying any such pain and contradicted by the opinions and evaluations of Dr. Puri, Dr. Laity, and Ms. Dwyer. R. at 25. Moreover, Plaintiff's general allegations that her depression and anxiety prevents her from being able to function in the workplace is unsupported by any medical evidence. Accordingly, the ALJ properly found that Plaintiff's subjective complaints about her symptoms were entitled to limited weight.

After reviewing the ALJ's decision, the applicable law, and the Record as a whole, the Court finds that the ALJ applied the proper legal standards and that his decision is supported by substantial evidence.

## V. CONCLUSION

Accordingly, it is hereby:

17

**ORDERED**, that the decision of the Commissioner is **AFFIRMED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:   March 31, 2016
         Albany, New York

_____
Lawrence E. Kahn
U.S. District Judge